RECEIVED
IN LAKE CHARLES, LA.
SEP 5 2013
TONY R. MOORE, CLERK
BY_____
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **HENRY W. JAUBERT, ET AL** | : | **DOCKET NO. 2:12-CV-00765** |
| **VS.** | : | **JUDGE MINALDI** |
| **OHMSTEDE LTD, ET AL** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 24], filed by the defendant, Ohmstede Ltd. ("Ohmstede"), and a Motion for Summary Judgment [Doc. 28], filed by the defendant, Local 37 International Brotherhood of Boilers ("Local 37"). The plaintiffs, Henry Jaubert and Gavin W. Campbell, filed an opposition [Doc. 32], and both Ohmstede [Doc. 33] and Local 37 [Doc. 34] filed replies. As the court finds the motions are fully briefed, they are ripe for review. For the foregoing reasons, the defendants' Motions for Summary Judgment are GRANTED.

## FACTUAL BACKGROUND

This case arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, as amended. The plaintiffs, who were members of Local 37 and employees of Ohmstede, allege that Ohmstede terminated them without good or just cause, and that this discharge was in violation of the collective bargaining agreement ("CBA") they had through Local 37 with Ohmstede. They also allege that, after their terminations, Local 37 refused to process their termination-related grievances through the CBA's grievance procedure,[1] and that this refusal was arbitrary, discriminatory, and in bad faith. The uncontested facts are as follows:

---

[1] The grievance procedure provides, in full:

1

Ohmstede manufactures and repairs custom shells for shell and tube heat exchangers for industrial facilities, particularly oil refineries. Both plaintiffs worked as welders in Ohmstede's fabrication plant in Sulphur, Louisiana. Campbell was the designated Union Steward assigned to the night shift, and Jaubert was a night shift leader. As members of Local 37, both received coverage under the CBA between Ohmstede and Local 37.

In October of 2011, the Ohmstede Sulphur plant was fabricating a shell cylinder which would become part of a high pressure heat exchanger Ohmstede was assembling for the BP

---

Section 1. Grievances are defined hereby to include only the discipline of employees and complaints involving the interpretation and application of the express provisions of this Agreement. The time limits contained herein are jurisdictional, and failure to comply with any time limit set forth herein shall result in the dismissal of the grievance. The time limits may be waived of extended by the mutual agreement of the parties hereto.

Section 2. All such grievances shall be resolved as follows:

Step 1. An employee, or an employee and his/her Shop Steward, must present the grievance to the employee's immediate supervisor within three (3) working days of the occurrence giving rise to the grievance.

Step 2. If an agreement resolving the grievance is not reached at Step 1, the grievance is to be reduced to writing, stating the Article and Paragraph of the contract claimed to have been violated, and presented to the Manufacturing Manager by the Shop Steward. To be considered by the Manufacturing Manager, such written grievance must be filed within seven (7) working days following the occurrence giving rise to the grievance.

Step 3. If not resolved at Step 2, the grievance may be taken up with the Company's Human Resources Department by the Union's Business Representative.

Section 3. In the event the grievance is not resolved or settled as provided above, and within ten (10) working days following the answer by the Human Resources Department, the Business Manager of the Union shall submit the grievance to the International Representative of the Union and the Company's President in an effort to resolve the dispute. If not successful, within five (5) working days, Arbitration may be demanded by submitting to the Federal Mediation and Conciliation Service, with a copy to the Company's President, a written request for a panel of seven (7) arbitrators from which one (1) arbitrator will be chosen. The parties shall flip a coin to determine who shall strike the first name from the panel of arbitrators, and thereafter the parties shall alternate striking names until only one arbitrator remains. Expenses of the arbitrator are to be paid equally by the Company and the Union. The arbitrator shall have no authority to alter or amend the Agreement in anyway. The decision of the arbitrator shall be final and binding on all parties.

Section 4. The rights and obligations created by this Article XXI shall be applicable and enforceable only during the term of this Agreement.

"Collective Bargaining Agreement," Ex. 1 to Ohmstede's Mot. for Summ. J., [Doc. 24-3], at p. 11.

Products Texas City Refinery. Ohmstede would ship the component part to another Ohmstede facility in LaPorte, Texas for assembly into a larger unit. BP's quality control inspector for the project was a consultant BP hired, Charles Cantrell. Notably, Cantrell did not perform quality control for Ohmstede – Ohmstede had its own quality control representative.

On October 5, 2011, Campbell called the Union's Business Manager, Lionel Hanna, to inform Hanna that Jaubert believed management had forced him to perform an unsafe weld on a BP shell cylinder which would affect the overall integrity of the vessel.

On or about October 6, 2011, Jaubert, with the assistance of Campbell as shop steward, filed a grievance with Local 37 complaining about the method Jaubert's superiors had instructed him to use for the repair, referring to the method as "illegal." Frank Burns (the day shift supervisor) assisted the plaintiffs in preparing their grievance, but admittedly skipped steps in the grievance procedure in doing so.

When Ohmstede received the grievance on October 7, 2011, Bill Reid (Ohmstede's President) directed Paul MacKnight (Ohmstede's Sulphur Plant Manager), Tim Fontenot (Ohmstede's Manufacturing Manager), and Jeff Musgrove (an Ohmstede welder with quality control responsibilities) to each prepare a report on what had occurred with respect to the repair. On October 9, 2011, David Hegeman (the District Manager and International Union District representative) called James Damron (Ohmstede's Human Resources representative) to request more time for the union to investigate the grievance, and subsequently faxed the grievance to Damron on October 13, 2011. After investigating, Ohmstede's internal investigation showed that there was no problem with the weld and that it had been done in accordance with accepted procedures. During this investigation, the plaintiffs expressed dissatisfaction with how slowly Local 37 was handling the grievance – it appears that they felt that time was of the essence, and

that if they did not act quickly enough, the faulty shell cylinder would make its way to BP before Ohmstede could render a decision. The plaintiffs were further spurred on by the concern that if something happened with the purportedly faulty cylinder, Jaubert could be held liable for performing the weld. Thus, on or about October 19, 2011, the plaintiffs personally placed a call to Cantrell, (as noted *supra*, BP's inspector) to ask Cantrell if he and BP were aware of the unsafe weld situation.

Soon after this call, Cantrell called Reid and to complain about receiving calls at home from two unidentified Ohmstede employees concerning an allegedly faulty weld for a BP shell cylinder. Ohmstede later identified the callers as the plaintiffs. Both Local 37 and Ohmstede allege that this unauthorized contact by the plaintiffs with the BP inspector violated Ohmstede policy because it went outside the proper Ohmstede "chain of command" for dealing with such an issue with a customer, and that it also constituted an unauthorized transmission of confidential company information in violation of Ohmstede's Policy 407-P.[2]

On the morning of October 20, 2011, Hegeman and Hanna first met at the Sulphur plant with Campbell and Burns to review the weld grievance filed by Jaubert. Campbell showed them cellphone pictures Jaubert had taken of the weld. Hegeman and Hanna told Campbell that Jaubert's taking of these pictures might have violated an Ohmstede policy. After some discussion, Campbell admitted at the meeting with Burns, Hanna and Hegeman that he and Jaubert had contacted Cantrell about the weld on October 19, 2011.

On the same day, after Hanna and Hegeman met with Campbell and Burns, the four men met with Reid and MacKnight. At that meeting, Reid advised the Local 37 representatives that

---

[2] Policy 407-P prohibits the "unauthorized disclosure of business secrets or confidential information" and states that violations can result in "disciplinary action up to and including termination." *See* "Personnel Policies and Procedures," Ex. 7 to Ohmstede's Mot. for Summ. J., [Doc. 24-3] at p. 26.

4

Ohmstede regarded the October 6th grievance as meritless because the weld technique used was sound, thus rendering the weld grievance "null." Reid further stated that the plaintiffs had violated company policy by making unauthorized contact with the customer (inspector Cantrell) concerning Jaubert's allegation about the weld, instead of addressing the matter through Ohmstede's chain of command and/or allowing the matter to progress through the CBA's grievance procedure. Reid advised the Local 37 representatives that the plaintiffs would be terminated for calling Cantrell directly without following Ohmstede's internal chain of command. In response, Hegeman asked Reid if there was some way to save their jobs. Hegeman and Hanna also asked to review the policy Reid had said the plaintiffs allegedly violated.

After this meeting, Ohmstede terminated the plaintiffs' employment on October 20, 2011, although the parties dispute exactly what reason Ohmstede cited for their terminations. The plaintiffs notified Burns that they planned to retain counsel. After they retained counsel, their lawyer drafted a grievance concerning the terminations, and Jaubert mailed the grievance to Local 37 on or about October 27, 2011.

Ohmstede and Local 37 submit that the October 20th meeting among Reid, Hegeman and Hanna, during which the basis for the terminations was discussed and reviewed, satisfied Section 3, Article XXI of the CBA's grievance procedure[3] (mentioned *supra* footnote 1) pursuant to which the dispute is presented at the last step to Ohmstede's President (Reid) and the

---

[3] At the October 20th meeting, Hegeman and Hanna requested the company policy that was violated and the termination documentation from Ohmstede. The termination notices and the company "employee conduct" personnel policy and procedure which prohibit "unauthorized disclosure of business secrets or confidential information" were sent to Hegeman by Ohmstede. Jaubert and Campbell, when hired, each had signed a statement that they had received Ohmstede's personnel policies and procedures.

International Representative of the Union (Hegeman). After the parties completed that step, the defendants assert that the plaintiffs' only option was arbitration.

After receiving and reviewing the personnel policy and termination documents from Ohmstede, Local 37, by letters from Hanna dated October 31, 2011, advised the plaintiffs that it was denying their termination grievances and declining to take the termination grievances to arbitration. Local 37 explained it was not willing to arbitrate because it believed that Ohmstede had just cause for the terminations, so the unlikelihood of success did not warrant the significant cost of an arbitration procedure. The plaintiffs responded by filing this suit.

Local 37 and Ohmstede now move for summary judgment, arguing that (1) Local 37 did not breach its duty of fair representation by refusing to take the plaintiffs' termination grievances to arbitration and (2) Ohmstede did not violate the CBA when it terminated the plaintiffs.

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine dispute of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at

323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party…" *Id.*

## LAW & ANALYSIS

### I. "Hybrid" Section 301 Breach of Contract and Fair Representation Suits

A § 301 breach of contract and fair representation suit consists of two distinct causes of action, one against the employer for breaching the CBA, and the other against the union for breaching its duty of fair representation. *See Reed v. United Transp. Union,* 488 U.S. 319, 328, 109 S.Ct. 621, 627, 102 L.Ed.2d 665 (1989). The two causes of action, however, are "inextricably interdependent," and have come to be known as a "hybrid" § 301/duty of fair representation suit. *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983). Hybrid § 301 actions are comprised of two elements: (1) an allegation that the employer breached the collective bargaining agreement; and (2) an allegation that the union breached its duty of fair representation. *See Thomas v. LTV Corp.,* 39 F.3d 611, 621 (5th Cir. 1994) (citing *DelCostello,* 462 U.S. at 164). A hybrid action may be brought against the employer, the union, or both; regardless, both elements must be proven. *See id.* Importantly for this case,

> … if the arbitration-and-grievance proceeding is the exclusive remedy for breach of the CBA, the employee may not sue his employer under section 301 until completion of the proceeding…The "indispensable predicate" for a section 301 action against an employer, based on a violation of a collective-bargaining agreement, is the union's breach of its duty of fair representation.

7

*Daigle v. Gulf State Utility Co.*, 794 F.2d 974, 977 (5th Cir. 1986), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986) (citations omitted) (emphasis added). Accordingly, as a threshold matter, the undersigned must address whether Local 37 breached its duty of fair representation when it declined to go forward with the plaintiffs' termination grievance.

## II.   Claim against Local 37 for Breach of Duty of Fair Representation

The Fifth Circuit, in *Landry v. The Cooper/T. Smith Stevedoring Co., Inc.*, 880 F.2d 846 (5th Cir. 1989) succinctly summarized what a union member must show in order to succeed on a breach of the duty of fair representation claim:

> A union must represent all employees fairly in its enforcement of a collective bargaining agreement. This duty of fair representation stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca* [*v. Spies,*] 386 U.S. [171,] 182 [(1967)], 87 S.Ct. [903,] 912.
>
> A union retains considerable discretion, however, in processing the grievances of its members. *Cox v. C.H. Masland & Sons*, 607 F.2d 138, 142 (5th Cir.1979); *Turner v. Air Transport Dispatchers Assoc.*, 468 F.2d 297, 299 (5th Cir.1972). An employee has no absolute right to have his grievance taken to arbitration, *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917, or to any other level of the grievance process. *Turner*, 468 F.2d at 300. Instead, a breach of the duty of fair representation occurs "only when the union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916.
>
> Under this test, a union may not "arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Id.* at 191, 87 S.Ct. at 917. Thus, the duty of fair representation imposes an obligation for a union to investigate a grievance in good faith. *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 347 (5th Cir.1980). A union also has an obligation to prosecute a grievance "with reasonable diligence unless it decided in good faith that the grievance lacked merit or for some other reason should not be pursued." *Hammons v. Adams*, 783 F.2d 597, 602 (5th Cir.1986).
>
> A union does not breach its duty of fair representation, however, through simple negligence or a mistake in judgment. *See Vaca*, 386 U.S. at 192-93, 87 S.Ct. at 918; *Connally v. Transcon Lines*, 583 F.2d 199, 203 (5th Cir.1978). We have upheld a determination that a union did not breach its duty when its conduct in processing an employee's grievance was "less than enthusiastic" and "not

> perfect." *Connally,* 583 F.2d at 202-203. The critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process. *See Hines,* 424 U.S. at 567-69, 96 S.Ct. at 1058.

*Id.* at 852.

In support of their argument that Local 37 breached its duty of fair representation, the plaintiffs present several arguments to show factual disputes exist on whether it was arbitrary, discriminatory, or in bad faith for Local 37 to deny their grievance.

First, the plaintiffs argue that there is a dispute of material fact on whether Local 37 denied the grievance after "further investigation" of the events, or else summarily accepted Reid's proffered reason for termination at face value – essentially, the plaintiffs raise the issue of whether Local 37 processed the grievance in a "perfunctory fashion." They note that the evidence shows that, as early as October 20th (seven days before the termination grievance was filed), Hanna had told them that he would not contest the terminations because it was apparent they had violated Ohmstede's confidentiality policy (Policy 407-P, *supra* footnote 2). Thus, the plaintiffs argue this shows Hanna made up his mind about the validity of the termination before the termination grievance was even filed on October 27th.

Second, related to the plaintiffs' first point, the plaintiffs also argue that the defendants obscure important facts in the chain of events which further show that Local 37 representatives took Reid's proffered reason for termination at face value, when in fact Jaubert's original weld grievance was valid, the plaintiffs' actions in directly reporting to Cantrell were justified, and the plaintiffs' terminations instead primarily resulted from Reid's discriminatory anti-union bias. The plaintiffs assert that the reason they called Cantrell in the first place is because, before the October 19th call, Reid had informed Campbell that he had already talked with BP and that BP was "okay" with the weld. They note that this is contradicted by direct testimony from Cantrell,

9

who acknowledged that he had not been told about the weld before the October 19th call. Cantrell also testified in his deposition that a failure on Ohmstede's part to report the crack that necessitated the weld in the first place was a "serious breach" of the agreed-upon protocol between Ohmstede and BP, which requires that any time such an incident occurs Ohmstede must draft a Non-Compliance Report and submit it to Cantrell and his supervisor at BP. When the plaintiffs flagged the weld issue for Cantrell, therefore, Cantrell took immediate action by placing a "hold" on the subject shell in order to run tests. Cantrell also testified that Fontenot had admitted to him that Ohmstede did not report the crack initially because it would have triggered procedures that would have delayed the shipment of the shell. The plaintiffs assert that these facts indicate that Ohmstede was cutting corners and "cheating" by not reporting the crack to BP, and that Jaubert and Campbell therefore had no choice but to go to inspector Cantrell directly. They note that prior actions on Reid's part (responding very negatively to filed grievances) shows that Reid was biased against them and had an agenda against grievances and grievants in general.[4] Therefore, Reid's termination of the plaintiffs did not take into account the surrounding circumstances (the plaintiffs taking action and reporting directly to Cantrell because Ohmstede allegedly would not do so) and instead stemmed solely from "discriminatory" anti-union bias.

Third, the plaintiffs also contest whether Local 37 even conducted an investigation in accordance with the grievance investigation procedures. Based on the evidence before the court, they assert that the only "investigation" that Local 37 may have conducted occurred over a span of "minutes" when Hanna and Hegeman asked for a copy of Policy 407-P after Reid declared

---

[4] Citing to Campbell's deposition testimony, the plaintiffs note that upon first reviewing the weld grievance, Reid "threw the papers toward the wall," proclaimed that the grievances were "a joke" and "the reason the company was going to shit." He also purportedly claimed that "everyone will be working in China if this (grievance) continues," and, miming urinating on Burns' leg, stated "this is what we're doing to one another with these grievances."

that they would be terminated for violating said policy. They submit that Local 37 makes the "incredible contention that it satisfied its fair representation obligation" by classifying the few minutes occupied by Reid announcing the plaintiffs' terminations, which prompted Hanna and Hegeman to ask if something could be done to save the plaintiffs' jobs, as satisfying Steps 1, 2, and 3 of the grievance procedure. They note that there is a temporal issue with this statement: namely, they question how Reid, Hanna, and Hegeman's actions on October 20th could constitute processing the grievance "through Step 3," when the termination grievance was not even filed until October 27th. Further, they note that there is evidence that shows that, during the time period between Local 37 receiving the termination grievance and then denying it, Local 37 representatives did not even know what the plaintiffs told Cantrell, whom the plaintiffs had contacted, and whether the contact had even harmed Ohmstede.

Fourth, the plaintiffs also argue that Local 37's decision to deny the grievance because arbitration could be expensive is debatable, because it was entirely possible that the grievance would not proceed all the way to the final step of arbitration. Essentially, the plaintiffs assert that the defendants have miscast Local 37's decision as a "decision not to arbitrate," when in fact the plaintiffs are asserting that Local 37's decision was a decision denying their grievance full stop.

Fifth, the plaintiffs submit that the additional proffered reason for the plaintiffs' termination (violating an Ohmstede policy against taking photos inside the facility) is suspect, because at the time Hanna and Hegeman told the plaintiffs that their taking of the photos might have violated an Ohmstede policy, the two men were unsure about whether such a policy even existed. Thus, this further shows a lack of investigation/arbitrariness on Hanna and Hegeman's part.

The defendants counter that the uncontested evidence shows that their investigation into the grievance was valid and conducted in accordance with the CBA grievance processing procedure. They note that the plaintiffs' October 27th grievance was not a new grievance, but instead was designated by the plaintiffs as an "amendment" of Jaubert's initial October 6th weld-related grievance and the plaintiffs' related actions in calling inspector Cantrell. As such, Local 37 representatives processed Jaubert's October 6th grievance on October 19th, one day prior to the October 20th meetings between Reid, MacKnight, Hegeman, Hanna, Campbell, and Burns. During the October 20th meeting, after learning that the plaintiffs had directly contacted inspector Cantrell about the weld, the parties discussed whether Ohmstede should terminate the plaintiffs. When Reid asserted that the plaintiffs would be terminated because they had violated the Ohmstede confidentiality policy, Hegeman if there was any way the plaintiffs could keep their jobs. Hanna and Hegeman also requested a copy of the policy Reid was referencing, in order to ascertain whether the plaintiffs had indeed violated said policy. Hegeman and Hanna reviewed and discussed the policy, and, after review, agreed that the contact with inspector Cantrell had violated Ohmstede's policy.

The defendants thus assert that, reviewing all of the actions taken by Local 37 and Ohmstede representatives at the October 20th, it is clear that this meeting satisfied Step 3 of the CBA grievance procedure.[5] Local 37 finished processing the grievance on October 31st when,

---

[5]Step 3 provides that:

> If not resolved at Step 2, the grievance may be taken up with the Company's Human Resources Department by the Union's Business Representative.
>
> In the event the grievance is not resolved or settled as provided [in Sections 1 and 2] above, and within ten (10) working days following the answer by the Human Resources Department, the Business Manager of the Union shall submit the grievance to the International Representative of the Union and the Company's President in an effort to resolve the dispute. If not successful, within five (5) working days, Arbitration may be demanded by submitting to the Federal Mediation and Conciliation Service, with a copy to the Company's President, a written request for a panel of

12

after reviewing the termination documents and the Ohmstede confidentiality policy, Local 37 informed the plaintiffs that they would not represent them in arbitration proceedings. Because the legwork had already been done, the defendants submit that there was no reason Local 37 representatives had to "repeat" Step 3 of the grievance procedure as it specifically related to the "amended" termination grievance by reprocessing the grievance (as requested by the plaintiffs). Therefore, because the defendants had completed Step 3 on October 20th, there was nothing else to do but assess whether Local 37 should proceed with arbitration on the plaintiffs' termination grievance.

The defendants also submit that there is no evidence in the record that Reid actually displayed anti-union bias – when asked in his deposition whether he had made the anti-union remarks, Reid responded that he "did not recall" making any mean-spirited remarks towards grievants. Finally, in response to the plaintiffs' contention that Hanna did not know the identity of the customer the plaintiffs had called, Local 37 provided an affidavit from Hanna, in which he states that he learned during the October 20th meeting that the contacted client was BP.

Even considering the evidence in the light most favorable to the plaintiffs, the plaintiffs' conclusory allegations that Local 37 merely performed a "perfunctory" investigation and/or acted based on hostile or discriminatory motives are without merit in light of the uncontested evidence in the record, and thus their allegations do not create a factual dispute on whether Local 37's actions breached the duty of fair representation. The uncontested evidence shows that,

---

seven (7) arbitrators from which one (1) arbitrator will be chosen. The parties shall flip a coin to determine who shall strike the first name from the panel of arbitrators, and thereafter the parties shall alternate striking names until only one arbitrator remains. Expenses of the arbitrator are to be paid equally by the Company and the Union. The arbitrator shall have no authority to alter or amend the Agreement in anyway. The decision of the arbitrator shall be final and binding on all parties.

immediately before the meetings between Hegeman, Hanna, Campbell, Reid, Burns, and MacKnight about the weld grievance, the plaintiffs admitted they called inspector Cantrell about the weld. The plaintiffs further admit that Ohmstede provided them with copies of the confidentiality agreement, and that the plaintiffs signed these copies. After discussion with Reid about whether the plaintiffs should be terminated for violating Policy 407-P, Hegeman and Hanna's sworn testimony shows that they asked if there was a way to save the plaintiffs' jobs, in addition to reviewing Policy 407-P to see if the plaintiffs had violated the policy.

The plaintiffs cite *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048 (1976), in which the Supreme Court interpreted its earlier ruling in *Vaca*, in order to show that Local 37's actions still fell within the universe of "perfunctory" investigation:

> In *Vaca* "we accept(ed) the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," 386 U.S., at 191, 87 S.Ct., at 917, 17 L.Ed.2d, at 856; and our ruling that the union had not breached its duty of fair representation in not pressing the employee's case to the last step of the grievance process stemmed from our evaluation of the manner in which the union had handled the grievance in its earlier stages. Although "the Union might well have breached its duty had it ignored (the employee's) complaint or had it processed the grievance in a perfunctory manner," "the Union conclude(d) both that arbitration would be fruitless and that the grievance should be dismissed" only after it had "processed the grievance into the fourth step, attempted to gather sufficient evidence to prove (the employee's) case, attempted to secure for (him) less vigorous work at the plant, and joined in the employer's efforts to have (him) rehabilitated." Id., at 194, 87 S.Ct., at 919, 17 L.Ed.2d, at 860.

*Id.* at 568 – 69. Essentially, the plaintiffs wish to show that *Vaca* and *Hines* require that Local 37 representatives should have done something more than they did before declining the plaintiffs' termination grievance. Important facts distinguish *Hines* from the case at bar, however – in *Hines*, the plaintiff-employees brought a § 301 suit against their employer (who had discharged them) and their union (who had represented them in later unsuccessful arbitration proceedings). *Id.* at 556. Subsequent information revealed that the original accusations that had led to the

14

plaintiffs' terminations were false, and that this falsity could have been discovered with a minimum of investigation on the union's part. *Id.* at 556–57. In this case, there is no allegation that Reid, or any other Ohmstede employee, falsely accused the plaintiffs of outside contact with inspector Cantrell – the plaintiffs *admitted* to the contact. While the plaintiffs may express a difference of opinion on whether the information they passed on to Cantrell was confidential or not under Policy 407-P's definition, the uncontested evidence further shows that the plaintiffs admitted to conduct that arguably fell under Policy 407-P, Local 37 representatives reviewed Policy 407-P themselves to assess whether the plaintiffs had violated it, and additionally asked Reid if the plaintiffs could keep their jobs. These uncontested facts do not indicate that Local 37 conducted a "perfunctory" investigation or made a judgment call based on missing facts before deciding not to go further with the grievance.

After reviewing the policy, Local 37 representatives agreed with Reid that the plaintiffs had clearly violated Ohmstede's confidentiality policy. As noted *supra*, "[a] union…has an obligation to prosecute a grievance 'with reasonable diligence unless it decided in good faith that the grievance lacked merit or for some other reason should not be pursued.'" *Landry,* 880 F.2d at 852 (citing *Hammons v. Adams,* 783 F.2d at 602)). While the plaintiffs cite *Lowe v. Stevedoring Co.*, 558 F.2d 769 (5th Cir. 1977) for the premise that a court will find that a union acted in "bad faith" by taking an employer's reason for termination at face value and refusing to process a termination grievance, this case is readily distinguishable. In *Lowe*, the Fifth Circuit found that a trial court had erroneously granted a Judgment N.O.V. when it reversed a jury's verdict that a longshoreman employee had been terminated "without just cause" for fighting with his supervisor, and that the longshoreman's union had breached its duty of fair representation by refusing to process the resulting grievance. *Id.* at 773. Unlike in this case, in which the plaintiffs

15

admitted to their conduct and there was an explicit confidentiality policy the plaintiffs had already signed off on, in *Lowe*, while the longshoreman admitted to the fight, there was no explicit employer policy against fighting. *See generally id.* Further, in *Lowe*, the Fifth Circuit found that "knifings, shootings, and baseball bat beatings" were commonplace, and thus it was possible that the longshoreman's fighting with his supervisor (which resulted in no injuries) was not "egregious" enough to necessitate termination. *Id.* at 773. In contrast, in the case at bar, none of the parties admit that it is common for Ohmstede employees to call either a customer or someone connected to a customer to reveal that Ohmstede had performed an "illegal" weld on a customer's product before an internal investigation has concluded.

Accordingly, based on the evidence provided to Local 37 during the October 20th meeting, review of Policy 407-P, and a finding that the plaintiffs had breached the confidentiality agreement contained in Policy 407-P by transmitting sensitive information about a weld to someone outside the company, it cannot be said that Local 37's decision that the plaintiffs' termination grievance "lacked merit" and "should not be pursued" was arbitrary, discriminatory, or in bad faith. Summary judgment in favor of Local 37 is therefore appropriate on this issue.

### III.     Claim against Ohmstede for Breach of CBA

Because Local 37 is entitled to summary judgment on the issue of whether it breached its duty of fair representation, the plaintiffs have failed to establish the "indispensable predicate" for a § 301 claim against the plaintiffs' employer, Ohmstede. *Daigle*, 794 F.2d at 977. Thus, Ohmstede is also entitled to summary judgment.

Lake Charles, Louisiana, this _5_ day of _Sept_ 2013.

_____
PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

17